TONI H. WHITE (SBN 210119)
ATTORNEY AT LAW
PO BOX 1081
El Dorado, CA. 95623
(530) 885-6244


Attorney for Defendant
KARI SONOVICH

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>       Plaintiff,<br><br>v.<br><br>SONOVICH<br><br>       Defendant. | No. 2:14-CR-00023 JAM<br><br>RENEWED MOTION TO REDUCE SENTENCE PURSUANT TO 18 U.S.C. § 3582(c)(1)(A)(i) (COMPASSIONATE RELEASE) |

INTRODUCTION

Ms. Sonovich, by and through undersigned counsel, respectfully moves this Court for a renewed compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A) based on the "extraordinary and compelling reasons" presented by the following: (i) the Bureau of Prisons released Ms. Sonovich pursuant to its authority under the CARES Act after deciding she was a low-risk offender; (ii) Ms. Sonovich is subject to being returned to the Bureau of Prisons unless she is granted compassionate release, (iii) Ms. Sonovich's parents have become incapacitated and she is the only caregiver available for them, (iv) Ms. Sonovich's incapacitated parents are the only caregivers for her minor son, (v) Ms. Sonovich remains at high risk for COVID-19 complications and FCI Dublin is not safely mitigating the spread of COVID-19 and (vi) the

1

warden at FCI Dublin recommended that Ms. Sonovich's Petition for Compassionate Release be granted.

After weighing the relevant factors under 18 U.S.C. § 3553(a), this Court should find that Ms. Sonovich has already has completed a sentence that is "sufficient, but not greater than necessary" to satisfy the goals of sentencing and it should reduce her sentence to time served.

The multiple medical crises plagued her family prior worsened significantly after she surrendered herself to complete her prison sentence. Her brother, for whom she was providing care before she surrendered, passed away as her elderly parents were unable to care for him. Her parents have now become incapacitated themselves.

Additionally, Ms. Sonovich's parents, now incapacitated, were the only caretakers for her minor son. The caretaking role for Ms. Sonovich's minor child cannot be filled by others.

Ms. Sonovich has high blood pressure and Factor 5 Leiden. Both of these conditions continue to placer her at higher risk for COVID-19 complications as set forth by Dr. Jonathan Laine in Ms. Sonovich's original compassionate release motion. The threat posed by COVID-19 is exacerbated by the conditions at FCI Dublin, the first hand account of which is detailed by Ms. Sonovich in the instant motion. As set forth below, the conditions at FCI Dublin are such that the facility is not safely mitigating COVID-19 spread. Given the increased transmissibility of the COVID-19 variants, re-incarceration of Ms. Sonovich puts her at high risk of infection.

Extensive detail as to the condition of Ms. Sonovich's parents, brother, the circumstances of her young son and her medical conditions were set forth in the original Motion for Compassionate Release. As such, and to avoid burdening the Court with a rendition here, the prior motion is incorporated by reference.

Ms. Sonovich filed a Motion for Compassionate Release before this Court on June 18, 2021. *ECF Doc. No. 112*. That Motion was denied. *ECF Doc. No. 122.* Ms. Sonovich surrendered to FCI Dublin on August 16, 2021. She filed a petition for compassionate release with the warden at Dublin on September 25, 2021. *See Exhibit B.* More than thirty days passed without a decision on the petition although defense counsel was recently advised by counsel for the Bureau of Prisons that the warden at Dublin had recommended that Ms. Sonovich's petition for compassionate release be granted[1]. In the meantime, she was released under the CARES Act on April 18, 2022. Apparently, since Ms. Sonovich was released pursuant to the CARES Act, the Bureau of Prisons "closed out" her compassionate release petition.[2]

I.

FACTS

Offense Conduct

The offense conduct was set forth in detail and is incorporated from the original Motion for Compassionate Release filed at ECF No. 112.

Family Health Conditions and Ms. Sonovich's Role as Caregiver

The family health conditions and Ms. Sonovich's role as caregiver were set forth in detail and are incorporated from the original Motion for Compassionate Release. Ms. Sonovich was caring for her elderly parents at the time she surrendered. She was also the only available caregiver for her brother, William Beauchamp, who was extremely ill and 100% disabled.

---

[1] BOP attorney Karen Carpenter advised defense counsel on April 4, 2022 that the Warden for FCI Dublin recommended Ms. Sonovich's compassionate release and that the recommendation had been sent to the Correctional Programs Division.

[2] Defense counsel was advised of this fact by BOP counsel Karen Carpenter on May 12, 2022.

William was an Army National Guard veteran who served during the First Gulf War. He was being treated by the VA and his letter detailed the caregiving that Ms. Sonovich was providing. After Ms. Sonovich surrendered, there was no one to care for her brother. Her parents were unable to provide the level of care for her brother that she was able to provide due to their frailty. Ms. Sonovich's brother was in need of a contrast dye heart procedure that, per his doctors, would have put him in renal failure. The procedure was put on hold until after Ms. Sonovich's prison term because he would require kidney dialysis that Ms. Sonovich's parents could not handle. Sadly, Ms. Sonovich's brother passed away while she was incarcerated. These family circumstances made Ms. Sonovich's incarceration extremely painful.

Ms. Sonovich was caregiving for her elderly parents as well. The details of that care are set forth in the original compassionate release motion and incorporated here. Since Ms. Sonovich's incarceration, her parents have decompensated to the point of being incapacitated. Her parents' doctor, Dr. Deva Gowda, wrote a letter for this Motion, dated May 5, 2022. *Exhibit A.* Dr. Gowda describes Ms. Beauchamp as an "elderly, frail lady who has metastatic lung cancer with shortness of breath and severe back pain. *Id.* She describes Mr. Beauchamp as an elderly gentleman with ischemic heart disease and severe PVD." *Id.* She states that, since Ms. Sonovich's absence, that the parents:

> [h]ave had difficulty caring for themselves and their grandson. They are unable to do household chores and are emotionally torn from not being able to care for their grandson's school and sports activities. Due to the worsening of both [parents'] multiple underlying health conditions, they are totally disabled from taking care of their activities of daily living and also caring for their 12-year old grandson. Kari Sonovich was their only caretaker and her absence has made them complete[ly] nonfunctional.

*Id.*

Ms. Sonovich's petition for compassionate release that she submitted to the Warden is attached as Exhibit B. It outlines details as to the family's situation and provides a letter from the

family physician as well as a letter from her parents along with medical records. Ms. Sonovich's mother recently fell and broke her hip requiring surgery. Additionally, she has been suffering from side effects from treatments for stage 4 lung cancer. She has previously fractured her back, she is frail, of low weight and often forgets to eat. She is also struggling with the progressive memory loss and is now losing sight in her eyes. Ms. Sonovich's father has heart disease, anemia, hypertension, high cholesterol, obesity and kidney issues.

The parents are the only caregivers for Ms. Sonovich's minor son, Jacob. Her father is the only driver in the home and he is struggling with his driving ability. The grandparents are tasked with schooling Jacob as well as taking him to school and church activities. Mr. Sonovich's father is exhausted and stressed every day trying to get Jacob to the places he needs to be and both parents are struggling to run the household. As their doctor reports, they have become nonfunctional.

<u>Ms. Sonovich's COVID-19 Risk Factors</u>

Ms. Sonovich also has her own health problems. She suffers from high blood pressure and factor 5 Leiden which have both been linked to worse outcomes in patients with COVID-19. Details of her medical conditions, and Dr. Laine's assessment of her elevated COVID-19 risk are incorporated from her original compassionate release motion.

<u>Circumstances at FCI Dublin</u>

Ms. Sonovich has now experienced the facility at FCI Dublin during the pandemic. She reports that her unit had a covid breakout in January of 2019. During that breakout, she and her fellow inmates had to stay in their cells and those who had covid were not removed from their unit. On multiple occasions, one of the paramedics would handle pill line medications, without gloves, after being in the quarantine unit.

New prisoners were arriving to quarantine several times per week from all over the country. They used the same corridors, chaplain and medical office when they were waiting for hours to be processed in and these areas were not cleaned after the new arrivals. Additionally, the punitive nature of quarantine caused many prisoners to hide their symptoms. When in quarantine, prisoners may not bring or buy any commissary, food, clock, radio or clothes for about three weeks. The quarantined prisoners have no access to phone, emails, t.v. or radio. The only beverage available was the water from a rusty toilet sink. Prisoners had no showers or change of clothes for days and reported being very cold in the concrete building.

The facility failed to provide clean masks to the inmates regularly. In fact, this never happened during Ms. Sonovich's entire stay with the exception of the last week when the facility was apparently directed by a task force to do so. The masks provided were white cloth masks that failed. The masks were of low quality and usually slipped down the face onto the chin. In fact, this is how most of the prisoners and some guards wore their masks all of the time. Some guards failed to wear a mask at all. Mask wearing was not enforced.

There was no way to wash hands with soap other than in the inmate's rooms. There was no soap or paper towels in the community sink areas and in the area known as J1 there were no hand sanitizer dispensers.

The facility did not allow for social distancing. The common area in the showers for dressing is approximately 5 feet by 7 feet and designed for four people. The communication room is a small unventilated area measuring 11 by 12 feet by 8 feet and holds seven prisoners at a time. The phones in that area were not cleaned between uses. Additionally, the phones are the old fashioned receiver with little holes that are inaccessible for cleaning. Inside the 6 foot by 11 foot cells, prisoners use the sink, toilet and sleep in bunkbeds that are all too close for social

distancing. In response to COVID-19, the facility removed half of the dining tables to provide for distance between tables but did not provide for distance between people at the tables. As a result, up to 8 prisoners shared each table and were, of course, unmasked during their time eating.

Prisoner counts were also an issue. Several times per day, the officers count prisoners. During this count, the officers were within two to three feet because they stood at the cell entrance and the adjacent corridors are only 5 feet wide. There are also ventilation problems because all the cells and common areas are connected through a central air system.

FCI Dublin also has a significant safety issue unrelated to COVID-19. All of the the doors are locked 24 hours a day without a way to unlock them en masse during an emergency. If if a fire had broken out, for example, there was one guard to open approximately 48 rooms with a key that sometimes worked only intermittently.

FCI Dublin is also under investigation for failing to address dangerous asbestos and mold conditions. The correctional officers union has sounded the alarm on this situation. According to Dublin's union president, Dublin Management's "failure to address unsafe and dangerous working conditions at FCI Dublin has put the health and safety of both employees and inmates at considerable risk." *Exhibit C.* Given the necessity of clean and effective ventilation in mitigating COVID-19 spread, this is very concerning.

### Proposed Release Plan

Prior to Ms. Sonovich's release pursuant to the CARES Act, her parents home was assessed by the Probation Department and determined to be a suitable and stable home. Her proposed release plan would be continuing in her current residence. She is also amenable to any conditions this Court would deem appropriate.

Currently, Ms. Sonovich is programming under CARES. On Monday, Ms. Sonovich commutes 1.5 hours each way to a Transition Skills and CBT lab which lasts from 9:00 am to 12:15pm. On Tuesday, she commutes 1.5 hours each way to an employment workshop which lasts for 1.5 hours. On Wednesday, she commutes 1.5 hours each way to attend treatment labeled ICBT for an hour. On Thursday, she commutes 1.5 hours each way to attend MRT for 1.5 hours. Sunday she commutes 1.5 hours each way to attend an employment lab for 1.5 hours.

The single count to which Ms. Sonovich pled arose out of offense conduct occurring over 13 years ago in 2008/2009. Ms. Sonovich had no record prior to the instant case. She was released from custody on the pending charges on February 6, 2014 and placed on pretrial supervision. She served a perfect term of pretrial supervision for nearly four and a half years until supervision was terminated pursuant to her Pretrial officer's request. In spite of no longer being under supervision, she continued her path of good behavior and, as of this date, has still avoided being involved in any criminal activity. Additionally, she continued programming and exhibiting good behavior while she was at FCI Dublin. As such, her requested release plan would be to transition to supervised release and be relieved of this current schedule of intensive programming so that she may be able to return to schooling her son and caretaking for her parents.

II.

MEMORANDUM OF POINTS AND AUTHORITIES

A.

MS. SONOVICH WAS RELEASED PURSUANT TO THE CARES ACT

In March 2020, in response to the COVID-19 public health emergency, Congress enacted the Coronavirus Aid, Relief, and Economic Security Act (CARES Act), PL 116-136, Mar. 27,

2020, 134 Stat. 281. The CARES Act, *inter alia*, authorized the Director of the Bureau of Prisons ("BOP") to "lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement" under 18 U.S.C. § 3624(c)(2). In a memorandum to the Director of the BOP, the Attorney General conveyed that "in assessing which inmates should be granted home confinement," the agency should "consider the totality of the circumstances for each individual inmate, the statutory requirements for home confinement, and [a] non-exhaustive list of discretionary factors" that included the individual's

     (i)     age and vulnerability to COVID-19;

     (ii)    security level, with priority for low- and minimum-security inmates;

     (iii)   disciplinary record, with priority for those with no violent or gang-related activity and no infractions in the last year;

     (iv)   PATTERN score, with priority for those with a minimum score;

     (v)    re-entry plan; and

     (vi)   offense and potential danger to the community.

Attorney General Memorandum, "Prioritization of Home Confinement as Appropriate in Response to COVID-19 Pandemic," Mar. 26, 2020, available at *https://www.bop.gov/coronavirus/docs/bop_memo_home_confinement.pdf*.

     Applying this screening process, the BOP released Ms. Sonovich pursuant to the CARES Act on April 18, 2022. Recognizing that home confinement does not terminate one's "confinement," these courts have granted compassionate release to CARES Act recipients. *See, e.g., United States v. Busby*, 16-cr-0211, Dkt. No. 133 (N.D. Tex. Apr. 20, 2021)[3]; *United States*

---

[3] In *Busby*, the government opposed compassionate release on the sole ground that the defendant's motion was moot because the BOP had directed him to serve the remainder of his

*v. Salvagno*, No. 02-cr-0051 (N.D.N.Y. Aug. 5, 2020); *United States v. Gamboa*, No. 09-cr-1741 (D.N.M. June 11, 2020); *United States v. Camp*, No. 11-cr-0155 (E.D.N.C. June 21, 2019); *see also United States v. Levi*, No. DKC-04-0235-29, Dkt. No. 2085 (D. Md. July 6, 2021) (reducing sentence to time served for defendant who had been transferred to home confinement under the CARES Act but was subsequently returned to custody on an alleged minor violation of release conditions).

B.

18 U.S.C. § 3582(C)(1)(A)(I) AUTHORIZES THE COURT TO GRANT A DEFENDANT'S COMPASSIONATE RELEASE MOTION IF THE COURT FINDS EXTRAORDINARY AND COMPELLING REASONS TO REDUCE AN OTHERWISE FINAL TERM OF IMPRISONMENT

The compassionate release statute grants sentencing courts authority to reduce an otherwise final term of imprisonment for "extraordinary and compelling reasons." 18 U.S.C. § 3582(c)(1)(A)(i). The statute provides:

(1) in any case--

(A) **the court**, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, **may reduce the term of imprisonment** (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), **after considering the factors set forth in section**

sentence on home confinement. The court held: "[T]he remaining portion of Defendant's 78-month custodial sentence remains intact. The BOP's home-confinement designation only means that Defendant is permitted to serve the remaining portion of his [] sentence at home under the supervision of the BOP. Still, should he violate the terms of his home confinement, the BOP could rescind the designation and re-incarcerate him." Dkt. No. 133, at 2-3.

**3553(a) to the extent that they are applicable, if it finds that**…(i) **extraordinary and compelling reasons warrant such a reduction**; . . . (ii)….**and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission**[.]
18 U.S.C. § 3582(c)(1)(A).[4]

The court has broad discretion to determine what constitutes "extraordinary and compelling reasons." *See United States v. Aruda*, 993 F.3d 797, 801 (9th Cir. 2021) (holding that the guidelines in U.S.S.G. § 1B1.13 may inform a district court's discretion for § 3582(c)(1)(A) motions filed by a defendant, but are not binding.).

C.

THE MEDICAL CRISIS FACED BY MS. SONOVICH'S PARENTS HAS PLACED HER IN A CARETAKING ROLE THAT CONSTITUTES AN EXTRAORDINARY AND COMPELLING REASON TO REDUCE HER TERM OF IMPRISONMENT

Courts have recognized that the necessity of a caring for a parent when there is no one else to fill that role constitutes an "extraordinary and compelling" reason to grant compassionate release. *United States v. Bucci*, 409 F. Supp. 3d 1, 2 (D. Mass. 2019)(When a defendant is the "only available caregiver" for an incapacitated parent (perhaps a more unique occurrence given that inmates may have siblings or other family members able to care for their parents), then, it is likewise an "extraordinary and compelling" reason warranting compassionate release.); *United States v. Hernandez*, Case No. 16-20091-CR-WILLIAMS, 2020 WL 4343991 (S.D. Fl. April 3, 2020)(extraordinary and compelling reasons warranting a compassionate release reduction where defendant was the only possible caregiver for his 84-year-old mother suffering from degenerative ocular disease and cancer (in remission) that renders her functionally blind and has mobility issues); see also *United States v. Lisi*, 440 F.Supp.3d 246 (S.D.N.Y. Feb. 24, 2020)(court found that if the defendant's claims are factually accurate, and he is the only person capable of caring

for his mother, then that would constitute an extraordinary and compelling reason for compassionate release.). This Court has addressed a similar issue in *United States v. Kesoyan*, No. 15-cr-236 JAM, 2020 WL2039028 (E.D.Cal. Apr. 28, 2020) [a defendant's need to caregive for her developmentally disabled son, who was deteriorating in the defendant's absence, constituted an extraordinary and compelling reason warranting a reduction in sentence.]. Ms. Sonovich's parents have become incapacitated as set forth in the letter provided by their doctor. Ms. Sonovich is the only caretaker available for them. This situation constitutes an extraordinary and compelling reason to reduce Ms. Sonovich's sentence.

### D.

### THE INCAPACITATION OF THE ONLY CAREGIVERS OF MS. SONOVICH'S MINOR SON SUPPORTS HER REQUEST FOR COMPASSIONATE RELEASE

While *Aruda* provides that the Court is not bound by U.S.S.G. § 1B1.13 when analyzing a defendant's compassionate release motion, Ms. Sonovich faces a specific situation set forth in U.S.S.G. § 1B1.13. Specifically, she seeks compassionate release under the "family circumstances" scenario in subdivision (C) of U.S.S.G. 1B1.13, Application Note 1. The incapacitation of her parents, who are the only caretakers for her minor son, constitutes an extraordinary and compelling reason supporting her compassionate release. In *United States v. England*, No. CR 18-61-GF-BMM, 2020 WL 4004477 at *2 (D. Mont. July 15, 2020), the Court found that compassionate release was appropriate in this circumstance based on the fact that the caretakers could not adequately care for defendant's minor child. See also *United States v. Olvera*, No. 20-cr-00428-GPC, 2021 WL 824757 at *3 (S.D. Cal. Mar 4, 2021) (compassionate release granted based on death of caregiver of minor child).

Ms. Sonovich's parents are the only caregivers for her minor son, Jacob. They have made a valiant effort to homeschool him, take him to his activities required for his schooling and maintain the household but they have become unable to continue in these activities.

E.

## MS. SONOVICH'S HEALTH CONDITIONS COMBINED WITH COVID-19 CONSTITUTE AN EXTRAORDINARY AND COMPELLING REASON TO REDUCE HER PRISON SENTENCE

Ms. Sonovich's medical condition and Dr. Laine's evaluation that she is at high risk for COVID-19 complications were set forth in detail in her original compassionate release motion and are incorporated here. Dr. Laine stated that Ms. Sonovich has previous melanoma in situ, high blood pressure and Factor 5 Leiden Mutation. Factor 5 Leiden is a genetic condition that predisposes patients to blood clots in their veins, typically in their legs or lungs. Dr. Laine stated that Ms. Sonovich's high blood pressure and Factor 5 Leiden put her at greater risk for developing complications should she get COVID-19.

Ms. Sonovich's medical conditions combine with the fact that FCI Dublin is not utilizing safe COVID-19 practices to make put her at risk for infection. In *United States v. Mathews*, No. 2:15-CR-00118 KJM, 557 F. Supp.3d 1057 (Aug 31, 2021), Judge Mueller found extraordinary and compelling reasons to release a defendant, who had multiple co-morbidities like Ms. Sonovich, based on his risk of infection. The Court found that "[r]isk of infection can be shown by demonstrating the facility where they reside is currently suffering from a COVID-19 outbreak or is at risk of an outbreak, for example, because it is a congregate living facility in which inmates and staff cannot consistently maintain safe physical distances [internal cite omitted]." *Id*.

at 1061[5]. The Court then addressed the rebuttable presumption it employs when a defendant, like Ms. Sonovich, has been vaccinated and goes on to find that the presumption can be rebutted by a "judicially noticeable information published by public health authorities, expert opinions and scientific studies." *Id*. The Court cites the loss of protective immunity and the potential of infection with a variant as circumstances that can rebut the presumption. *Id*.

There is question as to the effectiveness of the vaccines against new and emerging variants. *See Exhibit D*. Furthermore, a subset of people has been identified that are not achieving full protection from the vaccines. *Id*. The fact is that we are seeing more transmissible COVID-19 with each variant, that the transmissibility will be exacerbated in confinement conditions and it is not yet clear who among us will be protected by the vaccines as we face these emerging variants. This is especially true at FCI Dublin given what Ms. Sonovich observed while she was incarcerated and given the facility's inability to cure asbestos and mold problems.

F.

A TIME-SERVED SENTENCE IS "SUFFICIENT, BUT NOT GREATER THAN NECESSARY" TO ACCOMPLISH THE GOALS OF SENTENCING UNDER 18 U.S.C. § 3553(a)

Once the Court finds extraordinary and compelling reasons to reduce a sentence, it must find that those reasons comport with 18 U.S.C. section 3553. *18 U.S.C. § 3582(c)(1)(A)*. Ms. Sonovich poses a low risk of recidivism or danger to the public. The psychological evaluation from Dr. Singer states that she is at a very low risk of reoffending. Her conviction is for a non-violent crime that occurred 13 years ago. She had not contact with the criminal justice system prior to the instant case, served a lengthy and perfect time on pretrial supervision, was out for voluntary surrender date with perfect behavior and was nothing but a productive community

member the entire time. Her involvement in the criminal conduct involved in this case was the result of an aberrant act of bad judgment and a naïve belief in a conman who committed fraud across multiple continents. She has served time at FCI Dublin during the pandemic in miserable circumstances. In spite of the hardships, Ms. Sonovich completed programming and had good behavior. Furthermore, the warden at FCI Dublin recommended that her compassionate release petition be granted and, due to errors within the facility, that petition languished in red tape until it was abandoned after she was released pursuant to the CARES Act. The section 3553 factors support a reduction in sentence for Ms. Sonovich.

III.

CONCLUSION

Given all of these factors, Ms. Sonovich requests that her sentence be reduced to time served and that she be allowed to immediately transition to supervised release in the community on whatever additional conditions the Court deems necessary.

Dated: May 14, 2022

By: /s/  Toni White
TONI WHITE
Attorney for Defendant
KARI SONOVICH